IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| MARY A. WEGLEY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 12-CV-198-PJC |
| ) | |
| MICHAEL ASTRUE, ) | |
| Acting Commissioner of the ) | |
| Social Security Administration, ) | |
| ) | |
| Defendant. ) | |

## OPINION AND ORDER

Claimant, Mary A. Wegley ("Wegley"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying Wegley's application for disability benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq*. In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. Wegley appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Wegley was not disabled. For the reasons discussed below, the Court AFFIRMS the Commissioner's decision.

### Claimant's Background

At the hearing before the ALJ on June 19, 2010, Wegley was 55 years old. (R. 26). She had a twelfth grade education. *Id*. Wegley had previously worked on an assembly line and as a cashier. (R. 31-32). Wegley claimed an inability to work due to pain from standing as well as

1

from sitting too long. (R. 27, 29). She testified that she experienced pain in her right foot when standing, and in her lower back, arms, and sometimes in her neck and shoulders. (R. 29).

Wegley testified that the maximum amount of time she could sit was 30 minutes before her legs, from her knees down to her feet, would begin to tingle. (R. 30). She testified she could stand for only 45 minutes before experiencing numbness in her toes and pain in her lower back. *Id.* Similarly, she testified she could walk only short distances, or approximately 30 minutes. *Id.* Wegley estimated she could lift no more than 20 pounds. *Id.*

Wegley also testified that when she used her hands, she would experience severe cramping in the right hand and wrist, with occasional burning in both hands. (R. 31). Wegley described being able to use her hands for only 15 minutes before needing to give them an hour-long break. *Id.* She testified that she had been diagnosed with severe nerve impingement in the wrist and elbow. (R. 33).

According to Wegley, she underwent neck surgery in July 2009 and had three vertebrae fused. (R. 34). She reported that the range of motion in her neck was limited and that she could no longer turn her head to the right as far as she could before the surgery. (R. 35-36). Wegley reported that neck pain caused difficulty sleeping three to four nights a week. (R. 36). She reported seeking chiropractic treatment for her neck, back, wrists, and leg. (R. 35).

Wegley also testified she suffered from diabetes, high cholesterol, high blood pressure, and a low thyroid. (R. 34). She stated that symptoms from these conditions caused dizziness for approximately one minute, once per month. (R. 34-35). Wegley recounted that in a typical day, she prepared meals, watched television, performed self-care, completed some chores, read, and rested. (R. 36-37). She reported no difficulties with driving, which she would do approximately once per week. (R. 37).

**Medical Evidence of Record**

On February 4, 2005, an MRI of Wegley's lumbar spine revealed "degenerative changes of the lumbar discs with dehydration and disc space narrowing from L2-L3 through L5-S1" and degeneration at T11-T12. (R. 180). A herniated disc at the L4-L5 level was also noted. *Id*.

In May 2007, Wegley began seeing Paul Harris, D.C., on what appears to be an as-needed, irregular basis. (R. 262-63). Dr. Harris' notes are entirely handwritten and with the exception of a few words, are essentially indecipherable.[1] *Id*.

On December 28, 2007, Wegley presented to Kala Omstead, D.O., with complaints of lower back pain and reported that she believed she had pulled a muscle while doing yard work. (R. 191-92). Wegley reported pain while walking and getting up from a seated position. *Id*. Dr. Omstead noted tightness of the lumbar spine and muscle spasm. *Id*. Dr. Omstead assessed Wegley with lower back pain and prescribed pain medications. (R. 192).

On October 10, 2008, Wegley was examined by James C. Mizell, M.D. (R. 223-25). Dr. Mizell noted that Wegley had "known degenerative disk disease in the neck and lumbar region," "some right sciatic," and had been treated by a chiropractor and had sought physical therapy. (R. 223). Wegley also reported recent discomfort, pain, and discoloration in her right shoulder. (R. 224). Dr. Mizell noted she had a history of similar problems in her shoulder. *Id*. It was also noted that Wegley demonstrated discomfort in her right forearm. *Id*. However, Dr. Mizell noted Wegley had a good range of motion of the right upper extremity and no tenderness. (R. 225). Wegley also reported difficulty sleeping, job stress, and seasonal sadness. (R. 224).

---

[1] The records appear to indicate she was treated for back, neck, shoulder, wrist, and hand pain. (R. 262-63). Wegley presented to Dr. Harris three times in 2007, eight times in 2008, and three times in 2009. *Id*.

Dr. Mizell's impressions included: history of Hodgkin's disease, hypertension, diabetes, hypothyroidism, depression, and hypercholesterolemia. (R. 225).

On February 6, 2009, Wegley presented to R. Tyler Boone, M.D., with complaints of pain in her cervical spine, which had reportedly worsened over a three-week period. (R. 253). Dr. Boone noted he had previously treated her for lumbar complaints. *Id*. It was noted that Wegley complained of "left posterior cervical and trapezial pain with radiation to the left triceps, dorsal and volar forearm," which worsened with movement of her neck. *Id*. Upon examination, Dr. Boone observed "good strength in the upper and lower extremities, except a trace of weakness [in the] left triceps" and a limited range of motion of the cervical spine. *Id*. X-rays revealed "significant disk space narrowing with anterior and posterior osteophytes C5-6 and C6-7." *Id*. Dr. Boone assessed Wegley with "cervical spondylosis[2] with left C7 and C8 radiculopathy/radiculitis." *Id*. It was noted that chiropractic treatment had made her symptoms worsen. *Id*. Dr. Boone prescribed pain medication and ordered an MRI of her cervical spine. *Id*.

On February 11, 2009, the MRI of Wegley's cervical spine was completed. (R. 259-60). The MRI findings indicated:

> 1. C6-C7 5 mm left lateral disc extrusion compressing the exiting C7 nerve root.
> 2. Multilevel disc desiccation changes and uncovertebral arthrosis results in moderate right C4-C5, moderate left C5-C6 and moderate to severe right C5-C6 neural foraminal stenosis. 3. C3-C4 4 mm central disc protrusion. 4. C4-C5 right paracentral disc protrusion with posterior bright annular fissure. 5. C5-C6 right posterolateral disc osteophyte complex.

---

[2] Cervical spondylosis is a degenerative joint disease affecting the cervical spine, which can cause pain or radiating paresthesia down the arms. *Dorland's Illustrated Medical Dictionary* 1684 (29th ed. 2000).

4

(R. 260). At Wegley's follow-up appointment with Dr. Boone on February 27, 2009, Dr. Boone noted that the "acute disk herniation foraminal left C6-7" was the cause of Wegley's symptoms. Because of the severity of symptoms, Dr. Boone opined that Wegley would need a cervical discectomy and fusion. *Id*.

On June 3, 2009, Wegley presented to Dr. Mizell for a follow-up appointment regarding her hypertension. (R. 452-54). It was noted that with medication, her hypertension was controlled and her diabetes was asymptomatic. (R. 452). Dr. Mizell did indicate Wegley had moderate bilateral arm pain and would be undergoing neck surgery. (R. 454).

On July 16, 2009, Wegley underwent a cervical discectomy and fusion at C5-C6 and C6-C7. (R. 370-74, 378-402). It was noted that Wegley initially had left shoulder pain in January 2009, which had increased and had not responded to treatment with anti-inflammatories and chiropractic manipulation. (R. 372). On the day of the procedure, Wegley complained of neck pain radiating into both arms, which worsened throughout the day and was exacerbated with movement of the head or neck. *Id*.

On August 5, 2009, Wegley presented to Dr. Boone for a postoperative visit. (R. 420). X-rays indicated "good position of plate and bone graft C5 to C7." *Id*. Dr. Boone instructed Wegley to continue to wear her hard collar and refilled her prescription of pain medication. *Id*.

On August 12, 2009, Wegley had a postoperative neurosurgery appointment. (R. 410). It was noted that Wegley was "doing quite well postoperatively with no neck pain and significantly improved arm symptoms." *Id*. However, Wegley did complain of "occasional hip pain from the bone harvest." *Id*. It was noted that her incision site was healing and motor and sensory examination were within normal limits. *Id*.

On August 18, 2009, Wegley presented to Dr. Boone for another follow-up appointment. (R. 419). X-rays again revealed good graft and plate position. *Id*. Dr. Boone noted that Wegley was "doing well" and that she was being weaned from wearing the collar. *Id*. Dr. Boone indicated Wegley should be completely weaned from the collar over the following week, should continue using a bone stimulator, and would begin physical therapy. *Id*.

Wegley returned to Dr. Boone on September 23, 2009. (R. 418). X-rays showed good progression of fusion healing. *Id*. Dr. Boone noted that Wegley was doing well and had been attending physical therapy. *Id*. Dr. Boone noted that Wegley would continue her therapy and use of the bone stimulator and should "avoid a lot of overhead activities." *Id*. Also on September 23, 2009, Dr. Detwiler noted that Wegley had reported significant improvement and discharged her from his care. (R. 412). Dr. Detwiler indicated that radiographic studies showed the bone was well-consolidated, and Wegley had normal strength, sensation, and reflexes. *Id*.

On October 2, 2009, Wegley had a routine appointment with Dr. Mizzell to evaluate her blood pressure and diabetes. (R. 449-51). He continued to note that her diabetes and hyperlipidemia were asymptomatic and her blood pressure was controlled. (R. 449). It was also noted that Wegley's cervical disc degeneration was under "fair control" with regular medication, and that she had completed physical therapy. *Id*.

On October 21, 2009, Wegley presented to Dr. Boone for another post-op appointment. (R. 459). X-rays revealed the cervical spine had "good fusion at both levels." *Id*. Wegley did complain of occasional trapezial pain as well as some right lateral shoulder pain with overhead activities. *Id*. Physical examination revealed a positive stress-test of the right shoulder, as well as a positive impingement re-enforcement sign. *Id.* Dr. Boone recommended impingement exercises for her shoulder and continued use of the bone stimulator. *Id*.

On March 23, 2010, Wegley presented to James F. Bischoff, M.D., with complaints of tingling and numbness in her hands. (R. 463). *Id.* Dr. Bischoff noted Wegley's previous cervical spine surgery and that she previously worked "doing mechanical activities with her hands" for over 10 years. *Id.* After an x-ray and physical examination, Dr. Bischoff opined Wegley had bilateral carpal tunnel syndrome. *Id.* Upon reviewing the results of EMG and nerve conduction studies, Dr. Bischoff subsequently noted that Wegley had "severe right carpal tunnel syndrome and severe cubital tunnel syndrome. The changes on the left side are minimal. The right is cervical." (R. 462, *see also* R. 458). He recommended surgical treatment, but Wegley indicated the timing was not good for her. (R. 462).

Wegley sought chiropractic treatment twice in May 2010 from Paul E. Harris, D.C. (R. 465-66). Wegley complained of right shoulder pain, arm/wrist pain, neck and lower back pain, and toe numbness. *Id.*

On November 10, 2010, Wegley presented to Jim B. Harjo, D.O., with complaints of insomnia, and lower back pain. (R. 521-23). Wegley described the pain as achy and numb, which radiated to the right thigh, and which was aggravated by daily activities. (R. 521). Dr. Harjo prescribed pain medication and indicated Wegley would need to go through a pain management specialist if she wanted more. (R. 522).

From January 2011 through July 2011, Wegley returned to Dr. Harjo several times to monitor her diabetes, hypertension, and to treat other ailments irrelevant to the issues in this case. (R. 524-46). During these visits, Dr. Harjo continued to include chronic pain and sciatica in the record, but there were no specific complaints of pain noted, and no corresponding examination or treatment recorded. *Id.*

**Examinations & Reports by Agency Consultants**

Agency consultant Ashock Kache, M.D., conducted a physical examination of Wegley on June 23, 2009. (R. 309-14). Wegley reported she was unable to work due to neck and back problems. (R. 309). Upon examination, Dr. Kache noted her cervical and lumbar spine had minimal limitations in range of motion testing; she had negative straight leg raises, normal heel and toe walking, and was able to ambulate without difficulty. (R. 310-13). Dr. Kache noted there were no motor or sensory deficits in Wegley's upper and lower extremities and neurologic examination was normal. (R. 310). Wegley also had a full range of motion in both hands and wrists, could make a fist with her hands, approximate fingertips, and could pick up and manipulate small objects with minimal difficulty. (R. 310, 314). Dr. Kache noted Wegley could "effectively grasp tools such as a hammer" "on occasion." (R. 314). Dr. Kache's assessment of Wegley included: diabetes, hypertension, history of cervical cancer, Hodgkin's lymphoma, benign breast lumpectomy, splenectomy, hysterectomy, and lymph gland removal. (R. 310).

On July 6, 2009, nonexamining agency consultant Burnard Pearce, Ph.D., completed a Psychiatric Review Technique form. (R. 315-28). Dr. Pearce found that Wegley did not have a severe mental impairment. (R. 315). In support of this opinion, Dr. Pearce noted that Wegley had not sought treatment from a mental health professional, did not take psychiatric medications, did not allege mental impairment on her initial application, had a steady work history, completed her activities of daily living, and medical records only referenced seasonal sadness and job stress. (R. 327). Dr. Pearce noted that Wegley had mild limitations in her activities of daily living, maintaining social functioning, and in maintaining, concentration, persistence, or pace. (R. 325). He also noted that Wegley had no episodes of decompensation of extended duration. *Id.*

Nonexamining agency consultant J. Marks-Snelling, D.O., completed a Physical Residual Functional Capacity Assessment on July 8, 2009. (R. 329-36). Dr. Marks-Snelling found that Wegley could frequently lift and carry ten pounds and occasionally lift and carry twenty pounds. (R. 330). She could stand or walk about six hours in an 8-hour work day. *Id.* Dr. Marks-Snelling found that Wegley could sit for about six hours in an 8-hour work day. *Id.* Her ability to push and pull was unlimited, other than the weight restrictions. *Id.* For narrative explanation of the findings, Dr. Marks-Snelling reviewed Wegley's medical history, noted her upcoming cervical fusion, her ability to perform activities of daily living, and Dr. Kache's examination. (R. 330). No postural, visual, communicative, or environmental limitations were noted. (R. 331-33). The only manipulative limitation Dr. Marks-Snelling indicated was that Wegley was "limited" in reaching, but other than a notation of cervical degenerative disc disease, no further description or explanation was provided. *Id.*

Nonexamining agency consultant Phillip Massad, Ph.D., reviewed the record on November 16, 2009, and affirmed Dr. Pearce's assessment. (R. 421). Also on November 16, 2009, nonexamining agency consultant John Pataki, M.D., reviewed the medical evidence in the record and affirmed Dr. Marks-Snelling's assessment. (R. 422).

## Procedural History

Wegley filed an application for disability insurance on March 30, 2009, under the Social Security Act, 42 U.S.C. §§ 401 *et seq*. (R. 92-93). Wegley alleged onset of disability as October 2, 2008. (R. 13, 92). Wegley's application was denied initially and on reconsideration. (R. 42-43). An administrative hearing was held before ALJ Lantz McClain on June 19, 2010. (R. 23-41). By decision dated July 21, 2010, the ALJ found that Wegley was not disabled. (R. 13-22). On February 27, 2012, the Appeals Council denied review of the ALJ's findings. (R. 1-6).

Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of further appeal. 20 C.F.R. § 404.981.

## Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if her "physical or mental impairment or impairments are of such severity that he is not only unable to do her previous work but cannot, considering her age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. § 404.1520.[3] *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988) (detailing steps). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Williams*, 844 F.2d at 750.

---

[3] Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510. Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit her ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings"). A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform her past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account her age, education, work experience, and RFC, can perform. *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). The Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id. (quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994)). The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner. *Hamlin,* 365 F.3d at 1214 (quotation omitted).

**Decision of the Administrative Law Judge**

The ALJ found that Wegley met insured status requirements through December 31, 2013. (R. 15). At Step One, the ALJ found that Wegley had not engaged in substantial gainful activity since her alleged onset date of October 2, 2008. *Id.* At Step Two, the ALJ found that Wegley had severe impairments of degenerative disc disease of the cervical spine, status post-surgery, diabetes, hypothyroidism, carpal tunnel and cubital tunnel syndrome. *Id.* At Step Three, the ALJ found that Wegley's impairments, or combination of impairments, did not meet the requirements of a Listing. (R. 16).

The ALJ determined that Wegley had the RFC to perform light work with the following limitations: no work above shoulder-level and "no constant use of the hands for repetitive tasks [such] as keyboarding." *Id.* At Step Four, the ALJ found that Wegley was capable of

performing her past relevant work as a cashier. (R. 22). Therefore, the ALJ found that Wegley was not disabled from October 2, 2008 through the date of the decision. *Id.*

## Review

On appeal, Wegley contends that the ALJ committed reversible error by implicitly rejecting portions of the opinions of agency consultants Dr. Kache and Dr. Marks-Snelling. Because the undersigned finds that the ALJ's decision is supported by substantial evidence and satisfies legal requirements, the ALJ's decision is affirmed.

Regarding opinion evidence, generally the opinion of a treating physician is given more weight than that of an examining consultant, and the opinion of a nonexamining consultant is given the least weight. *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004). A treating physician opinion must be given controlling weight if it is supported by "medically acceptable clinical and laboratory diagnostic techniques," and it is not inconsistent with other substantial evidence in the record. *Hamlin*, 365 F.3d at 1215. *See also* 20 C.F.R. § 404.1527(d)(2). Even if the opinion of a treating physician is not entitled to controlling weight, it is still entitled to deference and must be weighed using the appropriate factors set out in Section 404.1527. *Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004). The ALJ is required to give specific reasons for the weight he assigns to a treating physician opinion, and if he rejects the opinion completely, then he must give specific legitimate reasons for that rejection. *Id.*

Wegley first asserts that reversal is required because the ALJ improperly rejected Dr. Kache's opinion that she could only grasp tools "on occasion." Wegley argues that this notation is "essentially" the same as Dr. Kache opining that Wegley should be restricted to occasional handling, and that restriction would preclude her from performing her past relevant work. Plaintiff's Brief, Dkt. # 15, p. 7. It is true that Dr. Kache indicated Wegley could effectively

grasp tools, such as a hammer, "on occasion." (R. 314). However, Dr. Kache also noted Wegley had a full range of motion in her hands and wrists, had no motor or sensory deficits in her upper extremities, could make a full fist, pick up small objects with minimal difficulty, could effectively oppose her thumb to her fingertips, and could manipulate small objects. (R. 310, 314). Nowhere does Dr. Kache, nor any of Wegley's treating physicians, opine that Wegley is limited to occasional handling.[4]

In addition, after reviewing all of the evidence of record, including Dr. Kache's assessment, Wegley's activities of daily living, and her other medical records, Dr. Marks-Snelling found that *no* limitations in handling had been established. (R. 332). Dr. Marks-Snelling was entitled to come to this conclusion based on the review of all the evidence, and the ALJ was entitled to rely on this opinion in formulating his RFC determination. The ALJ's RFC, which was more favorable to Wegley because it limited her from constant use of her hands for repetitive tasks, was supported by substantial evidence. (R. 16). There is simply no objective or opinion evidence supporting Wegley's argument that the ALJ was required to include occasional handling in formulating the RFC. *Flaherty v. Astrue*, 515 F.3d 1067, 1071 (10th Cir. 2007) (nonexamining consultant's opinion was an acceptable medical source which the ALJ was entitled to consider and which supported his RFC determination); *Franklin v. Astrue*, 450 Fed. Appx. 782, 790 (10th Cir. 2011) (unpublished) (RFC assessment of nonexamining consultant was part of substantial evidence that supported the ALJ's findings); *Weaver v. Astrue*, 353 Fed. Appx. 151, 154-55 (10th Cir. 2009) (unpublished).

---

[4] Handling is not synonymous with grasping; grasping is only one component of handling. *See* Social Security Regulation ("SSR") 85-15 (defining handling as "seizing, holding, grasping, turning or otherwise working primarily with the whole hand or hands").

Wegley also argues the ALJ's RFC was inconsistent with Dr. Marks-Snelling's opinion that Wegley was limited in her ability to reach all directions. In completing the Physical RFC form, Dr. Marks-Snelling did check a box indicating Wegley's ability to "reach[ ] all directions (including overhead)" was "limited." (R. 332). In contrast, the ALJ recited that Dr. Marks-Snelling opined Wegley was limited only to "overhead reaching," and the ALJ's RFC contained no specific reaching restrictions, other than not working above shoulder level. (R. 16, 20). This is somewhat inconsistent, but the fact that there is an inconsistency does not *per se* make the ALJ's decision unsupported by substantial evidence. Under the circumstances of this case, that one inconsistency does not demonstrate objective evidence of functional limitations. This minor error does not "undermine confidence in the determination of this case." *Gay v. Sullivan*, 986 F.2d 1336, 1341 n.3 (10th Cir. 1993); *Whitney v. Barnhart*, 60 Fed. Appx. 266, 268 n.1 (10th Cir. 2003) (unpublished) (inconsistency in the ALJ's reference to assessment was not material).

The Court agrees with the Commissioner that Dr. Marks-Snelling did not explain or describe the extent of the reaching limitation; Dr. Marks-Snelling only noted Wegley's diagnosis of cervical degenerative disc degeneration. (R. 332). A "true medical opinion" is a statement from an "acceptable medical source" and contains a doctor's "judgment about the nature and severity of [the claimant's] physical limitations, or any information about what activities [the claimant] could still perform." *Cowan v. Astrue,* 552 F.3d 1182,1188-89 (10th Cir. 2008), 20 C.F.R. § 1527(a)(2). Dr. Marks-Snelling's checkmark provides no information concerning the severity of Wegley's reaching limitation or any information about what she could or could not do. As noted by the ALJ, the maximum restriction Wegley's own treating physician placed on her following her surgery was to "avoid a lot of overhead activities." (R. 21, 460). The Court finds no error in the ALJ's omission of reaching limitations from the RFC.

The ALJ's discussion demonstrates that he fully considered the objective and opinion evidence of record. The Court finds that his analysis was adequate, given the totality of his decision. *See Kruse v. Astrue*, 436 Fed.Appx. 879, 883 (10th Cir. 2011) (unpublished) (finding that the ALJ's weighing of medical opinion evidence was "readily apparent" even though he did not "state a specific weight"). As the Tenth Circuit recently explained in affirming the portion of an ALJ's decision addressing opinion evidence:

> Where, as here, we can follow the adjudicator's reasoning in conducting our review, and can determine that correct legal standards have been applied, merely technical omissions in the ALJ's reasoning do not dictate reversal. In conducting our review, we should, indeed must, exercise common sense. The more comprehensive the ALJ's explanation, the easier our task; but we cannot insist on technical perfection.

*Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1166 (10th Cir. 2012). *See also Doyal v. Barnhart*, 331 F.3d 758, 761 (10th Cir. 2003) ("the form of words should not obscure the substance of what the ALJ actually did"); *Lauxman v. Astrue*, 321 Fed. Appx. 766, 769 (10th Cir. 2009) (unpublished) (while "it would have been helpful if the ALJ had elaborated on his treatment" of opinion evidence, the ALJ's decision was adequate).

Wegley does not cite to anything in her objective medical records that is inconsistent with the ALJ's RFC. Nor does she contest that the ALJ fully discussed the medical evidence of record or her own testimony and credibility. The ALJ took into consideration the fact that after receiving the spinal fusion (which was also subsequent to the consultant's assessments), Wegley voiced few complaints and received minimal medical care. (R. 19-21). It is entirely proper for the ALJ to consider her infrequent medical contacts and infrequent attempts to obtain relief for her allegedly disabling impairments. *Branum v. Barnhart*, 385 F.3d 1268, 1274 (10th Cir. 2004);

*Thompson v. Sullivan,* 987 F.2d 1482, 1489 (10th Cir. 1993) (frequency of medical contacts is one factor to consider in determining the credibility of pain testimony).

Given the ALJ's thorough discussion of the objective and opinion evidence of record, his credibility determination, and the substantial evidence in the record supporting his RFC finding, the ALJ did not err in his weighing of the agency consultant's brief notations and/or opinions. The decision of the Commissioner is supported by substantial evidence and the correct legal standards were applied. The decision is **AFFIRMED.**

Dated this 12th day of September, 2013.

_____
Paul J. Cleary
United States Magistrate Judge